# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| SHAVONDA BLAIR, | : | Case No. 1:21-cv-766 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| PNC BANK, N.A., | : | |
| Defendant. | : | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

This civil case is before the Court on a motion to dismiss (Doc. 5) by Defendant PNC Bank, N.A. ("PNC") and responsive memoranda (Docs. 7 and 10).

## I. FACTS AS ALLEGED BY PLAINTIFF

Plaintiff Shavonda Blair ("Plaintiff" or "Ms. Blair") is a homeowner in Cincinnati. (Doc. 1). Around March 18, 2014, Ms. Blair executed a promissory note for $75,660.00 (the "Note") and received a mortgage on her home (the "Mortgage") securing the Note (collectively, the "Loan"). *Id.* at ¶ 2. PNC owns and services the Loan. *Id.* at ¶ 5.

Plaintiff's name is the only one that appears on the recorded deed and the Note filed in the Hamilton County Recorder's Office. (Doc. 1-2 at 2-7). But when Plaintiff took out the Loan she was married to Joshua Blair. Thus, the recorded Mortgage defines "Borrower" as both "Shavonda Blair and Joshua D Blair, Wife And Husband." (Doc. 1-2 at pp. 1-3). At some point before April 2018, Plaintiff and Mr. Blair divorced.

By April 2018, Plaintiff had defaulted on her mortgage and applied to PNC for loss mitigation assistance. (Doc. 1 ¶ 38; 1-1 at p. 19). PNC approved Plaintiff for a "Trial

Payment Plan" (Doc. 1 at ¶ 38) while simultaneously initiating foreclosure proceedings against her (*id.* at 30(b)). Plaintiff completed the trial period payments and, on December 19, 2018, PNC notified Plaintiff that it was prepared to offer her a permanent loan modification option. *Id.* at ¶ 17. The letter from PNC contained a proposed loan modification agreement. The agreement warned, "If we do not receive the executed Loan Modification Agreement by January 2, 2019, this Offer will be considered revoked." (Doc. 1-1 at 3). Like the original Mortgage, the modification agreement defined "Borrower" as "SHAVONDA BLAIR AND JOHSUA D. BLAIR." *Id.* at 1. Thus, even though Mr. Blair had no ownership interest in the home, the modification agreement required the signatures of both Plaintiff and Joshua Blair. (Doc. 1-1 at pp. 11, 13, 14). Plaintiff attempted to secure her ex-husband's signature on the modification agreement, but he refused. (Doc. 1-4 at p. 1). Nevertheless, PNC contacted Plaintiff several times between December 2018 and January 2019 requesting that she instead secure a quitclaim deed relinquishing whatever interest Plaintiff's ex-husband had in her home. (Doc. 1 at ¶ 23). The complaint does not indicate whether Mr. Blair refused to provide a quitclaim deed or if Plaintiff did not attempt to secure one from him. In any event, Plaintiff did not produce a quitclaim deed, nor did she ever return the signed loan modification agreement, and, as a result, the proposed modification agreement expired. (Doc. 1 at ¶ 22). On January 8, 2019, PNC sent Plaintiff a letter informing her that PNC was "unable to proceed further with [Plaintiff's] request for assistance" because "the executed [loan

modification] documents were not received within the required time frame." (Doc. 10-1).[1]

By June 2019, Plaintiff had retained counsel to represent her both in her ongoing foreclosure proceedings,[2] and in her correspondence with PNC, (Doc. 1 at ¶ 25). Through counsel, on June 24, 2019 (more than five months after PNC denied the loan modification), Plaintiff sent PNC a letter purporting to be a Notice of Error ("the NOE"). *Id.* at ¶ 25. The NOE asserted that "Ms. Blair [wa]s entitled to receive a final modification plan," and it was an error that "PNC ha[d] not provided" one. (Doc. 1-3 at 3). It further argued that, because Mr. Blair "was not on the original deed," "[n]or was [he] on the Promissory Note," his signature should not have been required to provide Plaintiff's final modification plan. *Id.* at 2-3.

PNC responded on July 25, 2019. *Id.* at 27. The response asserts that Plaintiff's "account [was] correct," and explains that "Ms. Blair's ex-husband was required to sign the agreement because his name is listed on the title and PNC had not received a quit claim deed." (Doc. 1-4 at p. 1).

---

[1] This document, though not included with the complaint, was originally an attachment to a document that *was* included with the complaint: PNC's response to Plaintiff's purported Notice of Error. (Doc 1-4 at 2). Plaintiff, for whatever reason, neglected to include the attachment. The Court may nevertheless consider the attachment without converting the motion to dismiss to a motion for summary judgment. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Additionally, extrinsic materials may be considered by a court if they "fill[] in the contours and details" of a complaint. *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir.1997).

[2] Attorney Matthew Fitzsimmons also represented Plaintiff in her foreclosure case. *See PNC Bank National Association v. Shavonda Blair, et al.*, Hamilton County Court of Common Pleas Case No. A 1802962 (Oct. 4, 2021).

3

Plaintiff now brings two Counts under RESPA's implementing regulations. Count I asserts liability under 12 C.F.R. § 1024.41(c) for PNC's failure to review a complete loss mitigation application within 30 days. Count II asserts liability under 12 C.F.R. § 1024.35(e) for PNC's failure to properly respond to Plaintiff's notice of error and perform a reasonable investigation or correct Plaintiff's asserted errors.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Federal Rule of Civil Procedure 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). Thus, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. For the Court to accept them, "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible

4

where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. ANALYSIS

"RESPA is a consumer protection statute that regulates the real estate settlement process." *James v. Ocwen Loan Serv., LLC*, No. 1:17-cv-0501, 2017 WL 6336760 at *4 (S.D. Ohio Dec. 12, 2017), report and recommendation adopted, 2018 WL 1173035. Congress intended RESPA "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). "Although the 'settlement process' targeted by the statute was originally limited to the negotiation and execution of mortgage contracts, the scope of the statute's provisions was expanded in 1990 to encompass loan servicing.'" *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013). "As a remedial statute, RESPA is construed broadly to effectuate its purposes." *Id.* at 719.

Plaintiff sues PNC under a body of regulations commonly referred to as Regulation X. 12 C.F.R. Part 1024. Regulation X consists of the Mortgage Servicing Rules

5

promulgated by the Consumer Financial Protection Bureau ("CFPB") pursuant to § 1022(b) of the Dodd-Frank Act, 12 U.S.C. § 5512(b), and RESPA, 12 U.S.C. § 2601, *et seq. Cooper v. Fay Serv., LLC*, 115 F. Supp. 3d 900, 903 n.6 (S.D. Ohio 2015). Count I asserts liability under 12 C.F.R. § 1024.41(c) for PNC's failure to review a complete loss mitigation application within thirty days. Count II asserts liability under 12 C.F.R. § 1024.35(e) for PNC's failure to properly respond to Plaintiff's notice of error and perform a reasonable investigation or correct Plaintiff's asserted errors.

### A. Plaintiff cannot state a claim under 12 C.F.R. § 1024.41(c) (Count I)

Count I asserts that PNC violated 12 C.F.R. § 1024.41(c) by failing to fully review Plaintiff's loss mitigation application. (Doc. 1 at ¶¶ 35-41). The parties do not dispute that Plaintiff submitted a "complete" loss mitigation application. Thus, 12 C.F.R. § 1024.41(c)(1) is the section of Regulation X that governed PNC's obligations. That section required PNC to (i) evaluate the loss mitigation options available to Plaintiff; (12 C.F.R. § 1024.41(c)(1)(i)); and (ii) provide written notice to Plaintiff of "which loss mitigation options, if any," PNC was willing to offer her, (*id.* § 1024.41(c)(1)(ii)). Section 1024.41(c)(1)(ii) further required PNC to provide an amount of time for Plaintiff to accept or reject an offer of a loss mitigation program, and apprise her of her right to appeal a decision denying her a loan modification option.

Plaintiff does not allege that PNC failed to comply with any of these requirements. Instead, Plaintiff accuses PNC of providing her "with *improper* loss mitigation options for her permanent modification." (Doc. 1 at ¶ 39) (emphasis supplied). Separately, Plaintiff alleges that PNC "fail[ed] to provide [her] with written notice of the proper

6

determination." *Id.* at ¶ 40. These claims are redundant. Offering an "improper" modification option is indistinguishable from failing to offer a "proper" modification option. At bottom, Plaintiff prescribes liability because she disagrees with the *form* of PNC's loan modification offer to Plaintiff. The Court cannot fill that prescription.

"Nothing in Regulation X imposes a duty on a loan servicer to provide a borrower with 'any specific loss mitigation option.'" *Urdanek v. Wells Fargo Bank, N.A.*, 734 Fed. App'x. 701, 704 (11th Cir. 2018) (quoting 12 C.F.R. § 1024.41(a)). Regulation X expressly authorizes loan servicers like PNC to make the "determinations of which loss mitigation options, *if any*, it will offer to the borrower." 12 C.F.R. § 1024.41(c)(1)(ii) (emphasis supplied). CFPB has explained that a servicer "has flexibility to establish its own application requirements and to decide the type and amount of information it will require from borrowers applying for loss mitigation options." *Mastin v. Ditech Fin., LLC*, No. 3:17CV368, 2018 WL 524871, at *8 (E.D. Va. Jan. 23, 2018) (quoting Consumer Fin. Prot. Bur., Official Interpretation to 36(c)(i)(ii), https://www.consumerfinance.gov/eregulations/1024-41/2015-18239#1024-41-b-2).

Here, PNC offered Plaintiff a loan modification option that required her ex-husband's signature. Plaintiff insists this option was "improper," but PNC is correct that Regulation X expresses no view on what options are "proper" or "improper." The regulation, by design, gives servicers plenary discretion to set the terms of loan modification agreements. Thus, even taking all of Plaintiff's factual allegations as true, the Court is left with no statutory basis to proclaim that PNC made a loan modification offer contrary to law.

Attempting to find such a basis elsewhere, Plaintiff points to Section 7 of the proposed loan modification agreement. Section 7 requires a borrower to warrant that "[a]ll persons who signed the [original] Loan Documents … have signed [the modification] Agreement." (Doc. 1-1 at 90). The agreement permits an exception. Where "the borrower and co-borrower are divorced and the Property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the Property need not sign this Agreement." *Id.* Plaintiff reads this exception as proof that PNC made a mistake by requiring Mr. Blair's signature. But Plaintiff's reading is too hopeful. By its express terms, the exception excuses an ex-spouse's signature only where "the Property has been transferred to one spouse in [a] divorce decree." (Doc. 1-1 at p. 8). No divorce decree exists to show that Mr. Blair has no interest in Plaintiff's home. That is presumably why PNC requested a quitclaim deed. Thus, nothing in Regulation X, nor PNC's proposed agreement itself, provides any basis for the Court to find the proposed agreement "improper." Plaintiff cannot sustain her claim under 12 C.F.R. § 1024.41(c). PNC's motion to dismiss Count I is therefore **GRANTED**.

### B. Plaintiff cannot state a claim under 12 C.F.R. § 1024.35 (Count II)

Plaintiff's second cause of action asserts liability for PNC's failure to properly respond to Plaintiff's NOE. In broad terms, RESPA provides that a borrower may submit a "Qualified Written Request" or "QWR" to their loan servicer requesting "information relating to the servicing of such loan." 12 U.S.C. § 2605(e)(1)(A). A QWR letter must identify the loan and include "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error." 12 U.S.C. § 2605(e)(1)(B).

8

Regulation X builds on these requirements. A QWR that asserts an "error relating to the servicing of a mortgage loan" is called a "Notice of Error" or "NOE." 12 C.F.R. § 1024.35(a). Under Regulation X, a loan servicer's response must either correct the "error or errors identified by the borrower," or conduct "a reasonable investigation" and provide written notice that no error has occurred, with reasons for that determination, and a statement about the borrower's right to request the information on which the loan servicer made the decision. 12 C.F.R. § 1024.35(e)(1).

Despite RESPA's dense regulatory scheme, Plaintiff's claim can be stated simply. She alleges that requiring her ex-husband's signature on the loan modification agreement was an error. She attempted to correct that error by sending PNC a letter she characterized as an NOE. PNC failed its statutory duty to properly investigate and correct that error in violation of 12 C.F.R. § 1024.35. And because of PNC's failure, Plaintiff was injured.

PNC attacks each link in this chain. First, and most importantly, PNC contests that it was an error to require Plaintiff's ex-husband to sign the modification agreement. Second, even if it were an error, PNC argues that it was not one of the enumerated categories of errors that can be the subject of an NOE under Regulation X. Third, even if the letter did qualify as an NOE, PNC argues that it did properly investigate the alleged error and respond accordingly. Finally, assuming it *was* an error to require Plaintiff's ex-husband to sign the agreement, *and* such errors are properly the subject of NOEs, *and* PNC failed to respond and investigate according to Regulation X, PNC argues that Plaintiff cannot plausibly allege damages from PNC's error.

9

The Court starts by addressing whether Plaintiff's letter was a genuine NOE. Even if PNC made no error, its obligations under Regulation X still kick in when a borrower *alleges* one of the enumerated errors in 12 C.F.R. § 1024.35.

Section 1024.35 identifies eleven categories of errors that trigger a loan servicer's obligation to investigate and respond. 12 C.F.R. § 1024.35(b)(1)-(11). In promulgating Regulation X, the CFPB emphasized that these eleven covered errors are a "limited list." Mortgage Servicing Rules, 78 Fed. Reg. at 10743-44; *see also id.* at 10739-40. Here, Plaintiff alleges PNC's error falls into 12 C.F.R. § 1024.35(b)(11) ("Section (b)(11)") which is a catchall provision encompassing "[a]ny other error relating to the servicing of a borrower's mortgage loan." As used in this section, RESPA defines "servicing" as

> receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts … and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

12 U.S.C. § 2605(i)(3); *see also* 12 CFR § 1024.2(b) (mirroring the definition in Regulation X). PNC asserts that Section (b)(11) does not accommodate Plaintiff's alleged error—requiring Mr. Blair's signature on the modification agreement—because loan modification is not within the definition of "servicing"

Plaintiff counters that Section (b)(11) is not strictly limited to "servicing" but also encompasses errors "relating to … servicing."

The Sixth Circuit has not yet determined if Section (b)(11)'s catchall provision addresses errors in the loan modification process. Other Circuit Courts of Appeal

10

generally agree that Section (b)(11) covers more than merely servicing errors, but these courts vary in their application to errors in the loan modification process. *Compare Naimoli v. Ocwen Loan Servicing, LLC*, 22 F.4th 376, 383-84 (2d Cir. 2022) (concluding that the phrase "error *relating to* the servicing of a borrower's mortgage loan" encompasses errors that make a borrower ineligible for a loan modification) *with Morgan v. Caliber Home Loans, Inc.*, 26 F.4th 643, 651 (4th Cir. 2022) ("The only error alleged … is denial of the loan modification based on title issues …. This does not fall within the ambit of 'servicing' so as to trigger RESPA's protections….").

This Court is persuaded that 12 C.F.R. § 1024.35(b)(11)'s catchall provision encompasses more than merely "servicing," but also errors "relating to … servicing." In particular, the Court agrees with the Second Circuit's nuanced observation in *Naimoli*:

> "[I]dentif[ying] … errors while in pursuit of a loss mitigation option does not impair their connection to the servicing of her loan. … [T]he fact that [Plaintiff] was seeking loss mitigation does not mean that the errors she identified are unrelated to servicing. In fact, erroneous loss mitigation eligibility determinations are excluded under § 1024.35(b) not because loss mitigation is unrelated to servicing, but because when the CFPB issued its 2013 Final Rule, it determined that allowing consumers to enforce the loss mitigation standards set by the loan's owner against a servicer would perversely risk discouraging consumer-friendly loss mitigation standards.

*Naimoli*, 22 F.4th at 384 (citing 78 Fed. Reg. at 10817-18). This passage echoes the Court's earlier observation that RESPA leaves loan servicers discretion to set the terms of their loan modification offers or offer no modification at all. *Supra* at 7. Thus, servicers are free to set their own standards for providing loan modification, but they are not

insulated from their obligation to investigate and correct errors merely because they are discovered while a borrower is applying for loan modification.

Here, reading the complaint in the light most favorable to Plaintiff, PNC's alleged error was requiring Mr. Blair's signature on the modification agreement. This was plausibly an error related to servicing because it suggests that PNC's records were incorrect about which people PNC could lawfully demand payment from. Accordingly, Plaintiff has plausibly alleged that her letter to PNC was an NOE that triggered PNC's obligations under Regulation X.

The next question for the Court is whether PNC complied with its obligations under Regulation X. Regulation X requires a loan servicer's response to an NOE to either correct the "error or errors identified by the borrower," or conduct "a reasonable investigation" and a provide written notice that no error has occurred, with reasons for that determination, and a statement about the borrower's right to request the information on which the loan servicer made the decision. *Poynter v. Rushmore Loan Mgmt. Servs. LLC*, No. 1:20-CV-247, 2022 WL 787870, at *6 (S.D. Ohio Mar. 15, 2022); 12 C.F.R. § 1024.35(e)(1). Dismissal is appropriate where a loan servicer has complied with the requirements of RESPA and Regulation X in responding to a NOE. *See Aazami v. Wells Fargo Bank, N.A.*, No. 3:17-CV-01564-BR, 2019 WL 281286, at *14 (D. Or. Jan. 22, 2019). That inquiry need not be more complicated than looking at the mortgage servicer's response and seeing if it fits the express terms of Regulation X in responding the errors alleged in Plaintiff's NOE. *See id.; Boedicker v. Rushmore Loan Mgmt. Servs., LLC*, No. 16-2798-JTM, 2018 WL 828039, at *3 (D. Kan. Feb. 12, 2018) (granting

defendant summary judgement on plaintiff's RESPA claim where "the uncontroverted facts show defendant complied with the regulation by timely responding to plaintiffs' questions and providing the explanation and documentation requested."). The key requirement is that the loan servicer conduct a "reasonable investigation," meaning, at minimum, a "search or inquiry … to test the validity of [the borrower's] complaints." *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 724 (S.D. Ohio 2014). Merely providing documents and a statement that there are no errors is not enough. *Id.*

      Here, the Court cannot conclude that PNC failed to perform a reasonable investigation and provide the appropriate written notice to Plaintiff. PNC's response to the NOE explained that it had "research[ed] the matter" and "determined that [Plaintiff's] account [wa]s correct." (Doc. 1-4). The letter went on to explain that "Ms. Blair's ex-husband was required to sign the agreement because his name is listed on the title and PNC had not received a quit claim deed." *Id.* Plaintiff's own documents illustrate that PNC's investigation was not only reasonable, but also that it reached the correct conclusion. Mr. Blair *does* appear as a Borrower on the original Mortgage document recorded in the Hamilton County Recorder's Office. (Doc. 1-2 at 8). Plaintiff's rebuttal that Mr. Blair had no ownership interest in the home is irrelevant. On paper, he stood to be bound to the terms of the Loan modification. If PNC's policy is to have every person whose name appears on the title documents sign the loan modification agreement, the Court has no authority to call that an error. Plaintiff therefore cannot state a claim under 12 C.F.R. § 1204.35 because she cannot establish that PNC failed its obligations under

13

that section. Accordingly, the Court need not reach PNC's arguments that Plaintiff cannot demonstrate damages or that Regulation X supplies no private right of action.

This case reduces to the simple observation that Joshua Blair's name *does* appear on the Mortgage document that formed a part of Plaintiff's title in the Hamilton County Recorder's Office. As troubling as it is that PNC effectively authorized Plaintiff's ex-husband to decide if Plaintiff could stay in her home, the Court is without power to call foul. PNC had discretion to set the terms of the loan modification agreement (which defeats Count I), and therefore PNC's reasonable investigation of the NOE correctly concluded PNC made no error in requiring Mr. Blair's signature (which defeats Count II). Thus, even if RESPA and Regulation X provide a private cause of action, it is unavailable to Ms. Blair. Ms. Blair's recourse was to appeal PNC's denial of her loan modification, or to reapply after securing her ex-husband's quitclaim deed.

## IV. CONCLUSION

Based upon the foregoing, the Motion to Dismiss (Doc. 5) is **GRANTED.** Plaintiff's claims are hereby **DISMISSED.** The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date: 7/28/2022

*s/ Timothy S. Black*
Timothy S. Black
United States Senior
District Judge

14